McKinney, J.,
delivered the opinion of the Court.
This was an action brought upon a paper of rather novel character ; but as no question is made upon the form or legal effect of the instrument, it may be treated, for the purposes of the present determination, as a promissory' note, for $2060.00, payable to Reese W. Porter, four months after date, at the Bank of Tennessee, at Nashville. The suit is against Brien, as one- of the makers, and Bradley, as an endorser of said note.
This note, perhaps on the day it bears date, was discounted by the “ Bank of Commerce,” (one of the Banks organized under the act of 1851-2, ch. 118.) for the accommodation of the makers, at the rate of fifteen per cent, per annum.
The suit is prosecuted for the benefit of said Bank, as appears from the record.
The defence rests upon a provision of the act of 1855-6, ch. 250, sec. 11, passed to amend the “ Free Banking law,” of 1851-2. The provision, in substance, is : that persons exercising the privilege of banking under the act of -1851-2, rt shall not be authorized to discount or shave notes, directly or indirectly, at a greater discount than the other banks are allowed, under existing laws; and a violation of this section shall forfeit all rights of banking, under this act;” and the *725 persons so offending, are also “ declared guilty of a misdemeanor, and, on conviction, shall be fined in a sum not less than fifty, nor more than five hundred dollars for each and every offence.”
In the construction of -this section of the act of 1855-6, the Circuit Judge held, that a violation of its provision amounted to an avoidance of the contract; to a forfeiture of the debt in toto; and, consequently, that no recovery could be had on a note thus illegally discounted.
For the plaintiff in error it is insisted, that this construction of the act is erroneous. The argument is, that the act does not, in terms, affect the contract, nor was it intended to avoid the contract, farther than to the extent of the usurious interest; that this act and the general usury laws of 1819, ch. 32, sec. 2, and 1835, ch. 50, sec. 4, are pari materia, and must be construed with reference to each other ; that the act of 1855-6 intended nothing more than to affect its violation with two consequences — a forfeiture of the privilege, and a criminal prosecution — leaving the contract, except for' the excess over the rate of interest allowed to other Banks, in force, as under the general usury laws.
Notwithstanding the plausibility of this construction of the law, we feel disposed, in view ,of the reasons of policy and expediency which led to its enactment, to yield to the construction given to it by .the circuit court.
It turned out, as might have been expected, that the so-called banks, organized .under the act of 1851-2, with but few exceptions, had departed from the legitimate business of banking; and had been converted into establishments for oppressing the community, by extorting usurious interest, under the pretext of discounting bills and notes, and in almost every other possible way. To check, if possible, these abuses, was the laudable object of the .act under consideration. And it is perfectly obvious that this intention can be carried into effect upon no other construction of the law than that adopted .by the Circuit Judge.
The argument' against .this construstion, that the act does *726 not, in terms, affect the contract, is of but little force. This was not necessary. It is well settled that a contract may be illegal, although not in contravention of the specific provisions of a statute, if it be opposed to the general policy and intent thereof. 6 Bing. N. C., 174. In the case of Begnis v. Armistead, 10 Bing., 110, the principle is distinctly stated, and is now well established, that “ every contract made for or about any matter or thing which is. prohibited and made unlawful by statute, is a void contract, though the statute does not mention that it shall be so, but only inflicts a penalty on the offender ; because the penalty implies a prohibition, though there are no prohibitory words in the statute.” Smith's Leading Cases, vol. 1, 284, top.
From this principle it follows, that where a note is discounted at a greater rate of discount than is allowed by law, the taint of illegality affects the whole and every part of the transaction ; not merely the contract for the exessive rate of discount, but the note itself, illegally discounted ; although the note, taken by itself, may have been an independent contract, and free from any objection.
The true import of the prohibition is somewhat difficult to be understood. The regular business of discounting notes, by deducting from their face the interest for the entire time they have to run, though in .itself usurious — as the borrower pays interest on the amount thus deducted — has been long sanctioned by the courts, rather from necessity than upon principle; and thus far the act is plain enough. But the prohibition upon the “Free Banks,” not to “shave” notes at a greater rate of discount than the other banks are allowed under existing laws, is not quite so clear. The term “ shave” has not, perhaps, heretofore been regarded as a technical term; but in our local jurisprudence, at least, it can no longer be regarded as untechnical, inasmuch as its use is sanctioned by the authors of the “ Code of Tennessee.”
• The popular signification of the phrase “ shaving notes,” as contradistinguished from the legitimate business of discounting negotiable paper by the Banks, is well understood. The *727 business of purchasing notes, in the market, at less than the amount called for on their face, or par value, is common amongst individuals in the community ; and by the act under consideration, the right to do so would seem to be impliedly conceded to corporations whose business it is to lend money, and exercise other functions of banking — under certain ' restrictions.
And this business of purchasing negotiable • paper is, to a ■ certain extent, sanctioned by law, although the purchaser may thereby get greatly more than legal interest for the use of his money. The distinction is between real transaction paper and paper made for the purpose of raising money by a sale in the market. See 7 Humph., 450; 4 Humph. 244. This distinction is important, between a loan, in the form of a sale, and an actual sale and purchase. The purchase must be actual, and made in good faith, and not merely colorable, to cover a usurious transaction. A note made in the course of a real business transaction, for which the original party has given a valuable consideration, is regarded as property ; and, like other property, the owner may sell it for the most he can get, and whatever profit the purchaser may make on his purchase, there is certainly nothing usurious in it. The owner may be induced, by doubts as to the solvency of the maker, or by the pressure of his necessities, to sell the note for less than its face, or less than its market value, and, in the absence of all fraud, this will not affect the validity of the transaction, or impart to it the character of usury. But if the note were made for the purpose of being sold, to raise money, or as an artifice to evade the usury laws, under the color of a sale and purchase of the paper, this will not avail; and the purchaser, under such circumstances, with knowledge of the facts, either actual, or inferable from the facts of the case, will be held guilty of usury, if the discount shall have been greater than the legal rate of interest. In this sense, the word “ shave” is to be understood in the act of Í855-6. And in this sense, and to this effect only, is the business of *728 “ shaving” notes, or other negotiable paper, either by individuals or banking corporations, tolerated by law. 2 Parsons on contracts, 421.
Judgment affirmed.